## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

|  |  |
|---|---|
| AMICUS, LLC, d/b/a<br>BROUGHTON PARTNERS<br><br>        Plaintiff,<br>v.<br><br>JOHNSON & VINES PLLC, AIAG, LLC, and<br>SPEEDWATER, LLC.<br><br>        Defendants. | Civil Action No.:<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Amicus, LLC, d/b/a Broughton Partners ("Broughton Partners"), by and through its undersigned counsel, files this Complaint asserting claims for damages and injunctive relief against Johnson & Vines PLLC ("Johnson Firm"), AIAG, LLC ("Attorney Group"), and Speedwater, LLC ("Speedwater"), showing the Court as follows:

### I.  PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff Broughton Partners is a Georgia limited liability company formed and existing under the laws of the State of Georgia with its principal office located at 110 Park of Commerce Drive, Suite 200, Savannah, Georgia 31405 and submits to the jurisdiction of this Court.

2.

Johnson & Vines PLLC ("Johnson Firm") is an Arkansas professional limited liability company formed and existing under the laws of the State of Arkansas. Johnson Firm is a law firm wholly owned by non-party Anthony Johnson. Johnson Firm represents plaintiffs in mass torts, class actions, and personal injury cases. Johnson

Firm may be served with a copy of the Summons and Complaint through its registered agent for service of process, Lyle D. Foster, at 901 N University Avenue, Little Rock, Arkansas, 72207.

3.

AIAG, LLC ("Attorney Group") is an Arkansas limited liability company formed and existing under the laws of the State of Arkansas. Attorney Group is a legal marketing company that is wholly owned by non-party Anthony Johnson. Attorney Group may be served with a copy of the Summons and Complaint through its registered agent for service of process, Lyle D. Foster, at 901 N University Avenue, Little Rock, Arkansas, 72207.

4.

Attorney Group serves as the marketing arm of Johnson Firm in order to grow Johnson Firm's mass tort practice by engaging in legal marketing to sign up plaintiffs. Attorney Group engages in marketing through various media platforms, including on Facebook and Instagram. These advertisements often instruct the potential claimant to either submit a form questionnaire or call a phone number. The calls and submitted questionnaires are routed to call centers where call center employees speak with potential claimants and determine whether they are suitable plaintiffs based on criteria provided by Johnson Firm. If the potential claimant meets the criteria, the call center sends the claimant a packet of information that includes an engagement letter.

5.

From 2019 through 2022, Intake Direct, LLC, a Savannah-based company affiliated with Plaintiff Broughton Partners, provided these call center services to Johnson Firm and Attorney Group.

6.

Speedwater, LLC ("Speedwater) is a Delaware limited liability company formed and existing under the laws of the State of Delaware. Speedwater is a data and legal marketing company. Speedwater may be served with a copy of the Summons and Complaint through its registered agent for service of process, The Corporation Trust Company, at Corporation Trust Center 1209 Orange St., Wilmington, Delaware 19801.

7.

This Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, in that the claims asserted by Plaintiff arise under federal law, namely, the Defense Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.* ("DTSA").

8.

This Court has supplemental and pendant subject-matter jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because such claims relate to Plaintiff's federal statutory claims in that they form part of the same case or controversy.

9.

This Court has personal jurisdiction over Defendants under Federal Rule of Civil Procedure 4, O.C.G.A. § 9-10-91, and the U.S. Constitution because they have transacted business in Georgia, including with Broughton Partners and its related company Intake Direct, LLC, as well as with attorneys and clients in Georgia, and because they caused injury to Broughton Partners in Georgia while regularly doing business and soliciting business in Georgia and while deriving substantial revenue from services rendered in Georgia, including through their relationships with Broughton Partners and Intake Direct, LLC.

10.

3

Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and the property that is subject of this action is in this District. Venue and jurisdiction are proper in this Court.

## II. GENERAL ALLEGATIONS

A. *Daniel Eichholz's obligations to Broughton Partners.*

11.

Broughton Partners is a legal marketing company that helps law firms vet and obtain leads for mass tort and other legal cases. Generally, Broughton Partners is hired by law firms to engage in marketing for claimants who may have been injured by pharmaceutical products or other cases that result in mass torts.

12.

Broughton Partners accomplishes this by placing advertisements on websites, television, magazines, and other channels. These advertisements either direct potential claimants to submit forms containing their contact information or direct them to call into call centers such as Intake Direct, LLC, a call center owned by the same owners of Broughton Partners.

13.

When potential claimants submit these forms or call an affiliated call center, their personal and contact information is logged. Further, either the questionnaire (in the case of online submissions) or call center employees ask certain questions ("Intake Criteria Questions") of the potential claimant to determine whether the potential claimant is a "qualified" lead—that is whether they meet the criteria to be a suitable plaintiff in a tort case.

14.

Broughton Partners maintains a confidential and proprietary database of these leads, including both qualified and non-qualified, for all of the mass torts for which it markets. The leads in the database can be exported from the database in the form of spreadsheets containing certain specific types of leads—for example, all leads associated with a particular mass tort such as talcum powder or Zantac. Those exported spreadsheets are called lead lists. The database of leads is valuable to Broughton Partners, and Broughton Partners derives value from its secrecy. For example, if the leads were disclosed to a competitor, the commonalities in the leads could be used and analyzed by competitors to derive a list of similar leads. In this way, the competitor would gain the benefit of Broughton Partners' marketing without any of the expense—essentially achieving a leg-up on Broughton Partners without doing the legwork. Also, if the leads were disclosed to competitors, then the competitor could market directly to those leads or to leads derived from Broughton Partners' leads, in order to sign them up as clients. That kind of marketing using Broughton Partners' leads would reduce the available claimants that Broughton Partners and its customer law firms could sign up because the potential claimant would already have engaged a law firm.

15.

Broughton Partners' owners (non-parties Cason Carter, Damon Barr, and Daniel Eichholz) executed the Broughton Partners Operating Agreement, effective January 1, 2019. The Operating Agreement lists Daniel Eichholz as a Member and Manager of the Company. Today, Eichholz is no longer a Manager or Member of the Company but is, instead, an economic interest holder.

16.

From the formation of Broughton Partners, when he was a Member and Manager, to the present, as an economic interest holder, Eichholz has been subject to reasonable and enforceable restrictive covenants under Broughton Partners' Operating Agreement.

17.

Eichholz entered into a non-disclosure covenant as part of his consideration to become a Member of Broughton Partners. Section 12.04(a) of Broughton Partners' Operating Agreement provides:

> Each Member acknowledges and agrees that during involvement with the Company, he will learn and have access to confidential and proprietary information regarding the Company, its processes and its respective customers and businesses (. . . "Confidential Information") and that the continued success of the Company depends in large part upon the non-disclosure of such Confidential Information. *Therefore, each Member hereby agrees and covenants not to disclose or use for his own benefit, or the benefit of any other person or entity, any Confidential Information,* unless or until all of the remaining Members consent in writing to such disclosure or use, or such disclosure is or becomes required by law or valid legal process (in which event such Member agrees that he shall immediately notify the Company prior to making such disclosure). *Such Member shall not knowingly disclose or reveal to any unauthorized person any Confidential Information relating to the Company or the Company's respective customers or businesses,* and such Member confirms that the Confidential Information constitutes the exclusive property of the Company.

(Emphasis added)

18.

Under Section 12.04(b) of Broughton Partners' Operating Agreement, the definition of the term "Confidential Information" includes data and information:

(1) "relating to the business of the Company, regardless of whether the data or information constitutes a trade secret as that term is defined in Code Section 10-1-761[1];

(2) disclosed to the Member or of which the Member became aware of as a consequence of his relationship with the Company;

(3) having value to the Company;

(4) not generally known to competitors of the Company; and

(5) which includes trade secrets, methods of operation, names of customers, price lists, financial information and;" subject to certain exceptions not relevant here."

19.

Section 5.02 of Broughton Partners' Operating Agreement provides that "[e]ach Manager shall act in a manner he or she believes in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances."

20.

In addition, under Section 5.02 of Broughton Partners' Operating Agreement, Managers may be liable to the Company for "loss or damage resulting from intentional misconduct or knowing violation of the law."

---

[1] Under O.C.G.A. § 10-1-761, "trade secret" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. O.C.G.A. § 10-1-761.

21.

In the scope of his former role as a Member and Manager of Broughton Partners, Eichholz had access to Broughton Partners' confidential and trade secret information.

22.

As discussed below, Eichholz disclosed confidential and proprietary lead lists, Intake Criteria Questions, and a report containing sensitive business information, all of which are Broughton Partners' trade secrets, to Anthony Johnson and others with full knowledge that those documents were confidential and proprietary and that, by sharing them, he had breached his confidentiality obligations. Johnson also knew that the documents were confidential and proprietary and that Eichholz had breached his confidentiality obligations by sharing them. Yet Eichholz and Johnson facilitated the dissemination of these trade secrets to Defendants, which are owned either in whole or in part by Johnson, Eichholz, or both and which misappropriated this information for their own benefit.

B. *Speedwater is formed and works with Audience Acuity to engage in legal marketing.*

23.

Around August 2020, Johnson, Eichholz, and Randy Nordstrom started working on a new data company in the legal marketing field. That new data company would eventually be Speedwater.

24.

Johnson, Eichholz, and Nordstrom had learned of a company called Audience Acuity, which possessed contact and consumer information on nearly every American adult.

25.

Johnson, Eichholz, and Nordstrom's business idea involved having the new data company license Audience Acuity's data in order to deploy that data in various ventures in the legal marketing field.

26.

In the late summer of 2020, Randy Nordstrom's existing company, Focus DMG, licensed the data from Audience Acuity.

27.

Even at the time, all the parties understood that the data license would eventually be held by a new data company that would ultimately be created by Johnson, Eichholz, and Nordstrom.

28.

Speedwater was formed in November 2020. Johnson, Eichholz, and Nordstrom were its members and each served as managers.

29.

In December 2020, Focus DMG's license of the Audience Acuity data was assigned by Focus DMG to Speedwater.

30.

Prior to and after Speedwater's formation, Johnson, Eichholz, and Nordstrom worked with Audience Acuity to test Audience Acuity's data.

31.

To do those tests, Eichholz and Johnson misappropriated Broughton Partners' trade secrets: a report analyzing Broughton Partners' talcum powder lead list (the

"Alliant Report") and Broughton Partners' talcum powder and Zantac lead lists themselves.

C. *Eichholz unlawfully discloses the Alliant Report.*

32.

The theft of the Alliant Report happened first. On September 24, 2020, Eichholz emailed a copy of the Alliant Report to Johnson, Nordstrom, and a representative of Audience Acuity.

33.

Broughton Partners had engaged Alliant Cooperative Data ("Alliant") to create the Alliant Report and a prospect audience to help Broughton Partners obtain leads for mass tort cases relating to talcum powder. Broughton Partners signed agreements with Alliant that include confidentiality and non-disclosure provisions.

34.

To create the report at Broughton Partner's request, Alliant compared Broughton Partner's talcum powder claimant lead list with Alliant's own data to identify common features among those claimants, such as demographic information and information related to what consumer brands those claimants tend to buy from. Alliant used those common features to create a "prospect" or "look-alike" audience of potential talcum powder claimants—in other words, a new lead list—using its data.

35.

Sensitive reports like the one attached to Eichholz's September 24, 2020 email are critical to Broughton Partners' business, and it takes reasonable measures to protect them from disclosure to outside parties. For example, Broughton Partners requires employees to sign confidentiality and non-disclosure agreements, protects its

information with single sign-on and multifactor authentication, and monitors data downloads and IP addresses through its third-party information technology provider.

36.

The report attached to Eichholz's email is a protected trade secret and contains Confidential Information, as Broughton Partners' Operating Agreement defines that term. No other Member of Broughton Partners authorized Eichholz to disclose that confidential and trade secret protected information.

37.

By transmitting the Alliant Report, Eichholz knowingly and intentionally disclosed Confidential Information and trade secret protected information to Johnson, Nordstrom, and Audience Acuity even though he knew or reasonably should have known that it was protected and that doing so would breach his non-disclosure covenant. Indeed, in the text of Eichholz's September 24, 2020 email, he states: "you guys should take a look at this. Do not tell anyone that I sent this to you and DO NOT SHARE THIS. I will get into a lot of trouble. Thank you[,] Daniel Eichholz[.]" (emphasis in original).

D. *Eichholz and Johnson unlawfully disclose Broughton Partners' lead lists.*

38.

Soon after sharing the Alliant Report with Audience Acuity, Johnson and Eichholz had calls with Audience Acuity about the Report. The Report itself contains trade secret information about the commonalities and shared consumer interests among the Broughton Partners' talcum powder leads, but the Report itself does not contain Broughton Partners' lead list or Alliant's prospect list. Johnson and Eichholz determined that more information was necessary to conduct proof of concept tests.

39.

In late September 2020, Eichholz directed a Broughton Partners subordinate employee to supply Eichholz with Broughton Partners' confidential and proprietary lists of leads for talcum powder mass tort cases, and the subordinate employee complied. Sensitive reports like Broughton Partners' confidential and proprietary lead lists are critical to Broughton Partners' business, and it takes reasonable measures to protect them from disclosure to outside parties. It does so by, for example, requiring employees to sign confidentiality and non-disclosure agreements, protecting its information with single sign-on and multifactor authentication, and monitoring data downloads and IP addresses through its third-party information technology provider.

40.

On October 1, 2020, Eichholz shared a Google Sheet containing Broughton Partners' confidential and proprietary lead lists for talcum powder mass tort cases with Anthony Johnson.

41.

Over the next several days, Eichholz and Johnson worked together to prepare the Google Sheet containing Broughton Partners' talcum powder leads to be shared with Audience Acuity.

42.

On October 8, Johnson and Eichholz shared the revised Google Sheet containing Broughton Partners' confidential and proprietary lead lists for talcum powder mass tort cases with Nordstrom, representatives of Audience Acuity, and an employee of Johnson Firm or Attorney Group.

E. _Johnson Firm and Attorney Group misappropriate more trade secrets in order to use Broughton Partners' work to improve their talcum powder and Zantac campaigns._

43.

In or around April 2021, Eichholz, who was working with Johnson Firm and Attorney Group, directed a Broughton Partners subordinate employee to supply Eichholz with Broughton Partners' confidential and proprietary lists of leads for Zantac mass tort cases, and the subordinate employee complied. As with the talcum powder lead list, the Zantac lead list is critical to Broughton Partners' business, and it takes reasonable measures to protect it (and all lead lists) from disclosure to outside parties.

44.

Eichholz knowingly and intentionally disclosed the Zantac lead list to outside parties, including Johnson Firm and Attorney Group.

45.

Broughton Partners has incurred (and continues to incur) considerable effort and expense to create its confidential and proprietary lead lists. For example, for the talcum powder and Zantac mass tort cases, Broughton Partners spent more than $21 million in advertising costs alone to develop the lead lists. That amount does not include overhead and administrative expenses that Broughton Partners has incurred (and continues to incur) to develop and secure the lead lists.

46.

Eichholz also misappropriated Broughton Partners' talcum powder and Zantac Intake Criteria Questions for use in the Johnson Firm's and Attorney Group's legal marketing campaigns that he was working on. Intake Criteria Questions are a series of questions—like a decision tree—that either online form submissions or call center

employees use to question a potential claimant to determine whether the claimant is "qualified" as a plaintiff based on the criteria for a particular mass tort.

47.

When a law firm hires Broughton Partners, the law firm tells Broughton Partners the criteria a potential claimant must meet for the firm to be willing to represent them. For example, the law firm might only want a plaintiff who had been using a product for a certain time and had suffered an injury that was severe enough to warrant litigation. It is Broughton Partners' job to turn the firms' criteria into questions that can be used to vet potential claimants during the brief minutes that a potential claimant is willing to interact with a call center employee or online portal. Broughton Partners spends significant resources (including two full-time staff members) to manage this process, prepare Intake Criteria Questions, and, just as important, the order of the questions. Broughton Partners' business intelligence team and company leadership also routinely evaluate Intake Criteria Questions to improve their effectiveness.

48.

The lead lists and Intake Criteria Questions are both Confidential Information and protected trade secrets. Among other things, their economic value to Broughton Partners derive from their confidentiality. For example, if competitors gained access to Broughton Partners' lead lists, those competitors could use them to generate look-alike audiences for marketing purposes, or offer those leads to law firm clients at lower rates than Broughton Partners—since the competitors would not have had to spend the more than $21 million that Broughton Partners spent to develop the lead lists—and thereby gain market share at Broughton Partners' expense.

49.

Lead lists and Intake Criteria Questions are critical to Broughton Partners' business, and it takes reasonable measures to protect them from disclosure to outside parties. It does so by, for example, requiring employees to sign confidentiality and non-disclosure agreements, protecting its information with single sign-on and multifactor authentication, and monitoring data downloads and IP addresses through its third-party information technology provider. No Member of Broughton Partners ever authorized Eichholz to disclose such confidential and trade secret-protected information.

50.

Eichholz knowingly and intentionally disclosed Confidential Information and trade secret protected information to Defendants even though he knew or reasonably should have known that it was protected and that doing so would breach his non-disclosure covenant.

51.

Eichholz acquired all confidential and protected trade secret information relevant to this action as a result of his former role as a Member and Manager of Broughton Partners. Eichholz knew or reasonably should have known that this information was proprietary.

F. *Defendants use the Alliant Report and the lead lists for their own benefit.*

52.

At the request of Johnson and Eichholz, Audience Acuity used Broughton Partners' lead list and the profile summary output to generate a prospect audience of talcum powder claimants.

53.

The prospect audience was valuable because it includes people who share similar qualities and behavioral traits to persons who are already known to be likely to buy the product or services being marketed to them.

54.

The prospect audience could not have been created without using Broughton Partner's confidential and proprietary talcum powder lead list.

55.

There were several purposes behind generating the prospect audience. The immediate goal was to serve as a proof of concept that would show the value of the Audience Acuity data and how that data could be used for legal marketing. Those purposes were validated, as Speedwater decided to renew the license of Audience Acuity's data for the full year, rather than discontinue the license after a trial period.

56.

In addition, the prospect audience could both be used for legal marketing by the Johnson Firm, Attorney Group, and Speedwater.

57.

Upon receipt of Broughton Partners' confidential and proprietary talcum powder lead list, Johnson, the owner of Johnson Firm and Attorney Group and a part-owner of Speedwater, shared it with employees of Johnson Firm and Attorney Group and others despite knowing they contained confidential and protected trade secret information, and Eichholz then replied to the group of conspirators to reach out to him with any questions.

58.

Johnson and Eichholz also shared the Prospect Audience and, upon information and belief, the Profile Summary with employees and agents of Johnson Firm and Attorney Group.

59.

Using Broughton Partners' trade secrets, including the Alliant Report, the talcum powder and Zantac lead lists, and the Intake Criteria Questions, as well as those products derived from Broughton Partners' trade secrets, Defendants ran marketing campaigns directed at Broughton Partners' leads directly, the prospect audience directly, and the now-validated Audience Acuity data, as well as to look-alike audiences generated by Facebook based on these lists. The goal of the advertising campaigns was to convert those leads into clients who would sign engagement letters with Johnson Firm and other law firms. The marketing campaigns were successful.

60.

Upon information and belief, the non-Johnson affiliated law firms who ultimately signed up claimants through the recipient group's use of Broughton Partners' lead lists or the look-alike audience derived from Broughton Partners' propriety and confidential lead lists compensated Eichholz, Johnson, Johnson Firm, and Attorney Group and others for the services they provided in connection with signing up clients using the look-alike lists.

61.

Based on data recovered to date, Defendants are known to have used the data derived from Broughton Partners' lead lists and the look alike audience generated from

those lists to generate over 8,000 potential clients. At least 1,200 of those potential clients in fact engaged Johnson Firm and other law firms as their attorneys.

62.

Johnson Firm and other law firms stand to recover substantial contingency fees as a result of their improper use of Broughton Partners' proprietary and confidential lead lists. In addition, Defendants stand to be compensated for providing these services to other law firms who signed up clients as a result of their improper use of Broughton Partners' proprietary and confidential lead lists.

63.

Upon information and belief, Defendants have stolen additional lists of confidential data, wrongfully generated additional leads, and converted additional cases which are not yet known to Broughton Partners and are continuing to engage in such unlawful activities.

64.

Defendants accomplished all of this without having to spend more than $21 million in advertising costs alone that Broughton Partners had to spend to build the lead lists. That gives Defendants an unfair and illegal competitive advantage in the market.

G. *Johnson Firm failed to pay balances due.*

65.

Dating back to 2019, Johnson Firm hired Broughton Partners to perform legal marketing services including identifying and vetting leads of potential mass tort clients.

66.

Johnson Firm agreed to pay Broughton Partners per case signed by Johnson Firm from Broughton Partners' leads.

18

67.

Pursuant to its agreement with Johnson Firm, Broughton Partners generated leads, which resulted in numerous signed cases for Johnson Firm, but Johnson Firm has failed and refused to pay Broughton Partners the sums agreed.

68.

Johnson Firm is presently indebted to Broughton Partners in an amount exceeding $361,000.00.

### III.   COUNT I

### VIOLATION OF THE DEFEND TRADE SECRETS ACT (DTSA) 18 U.S.C. §§ 1836, *et seq.*

69.

Plaintiff incorporates by reference Paragraphs 1 through 64 of its Complaint as if set forth verbatim.

70.

The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (the "DTSA") creates a private cause of action for, "[a]n owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

71.

Broughton Partners' Alliant report, lead lists, and form site logic are used in Broughton Partners' business operations and interstate commerce.

72.

The DTSA defines a "trade secret" as "

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas,

designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

    (A) the owner thereof has taken reasonable measures to keep such information secret; and

    (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).

73.

The Alliant report, lead lists, and form site logic that Eichholz disclosed to Defendants without the consent of Broughton Partners' other Members contain or constitute trade secret information under the DTSA, as the information derives economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use. This information is and at all relevant times has been subject to reasonable efforts by Broughton Partners to maintain its secrecy.

74.

The term "misappropriation" is defined under the DTSA to include both the acquisition of a trade secret and its disclosure. 18 U.S.C. § 1839(5)(A-B).

75.

Defendants unlawfully misappropriated Broughton Partners' trade secret information and Broughton Partners has sustained, and will continue to sustain, irreparable harm as a direct and proximate result of their unlawful actions. Unless otherwise restrained by this Court, Defendants will cause further irreparable injury to Broughton Partners, for which there will be no adequate remedy at law.

76.

Defendants knew or reasonably should have known that the information disclosed was acquired under circumstances that gave rise to a duty to maintain its secrecy and was acquired from persons who owed a duty to Broughton Partners to maintain its secrecy.

77.

Defendants unlawfully misappropriated Broughton Partners' trade secret information by acquiring it and, upon information and belief, disclosing and using it with knowledge that it was acquired through a person who had used improper means to acquire it.

78.

The DTSA authorizes the Court to grant injunctive relief, monetary damages and, where a trade secret is found to have been willfully and maliciously appropriated, exemplary damages and attorneys' fees to the prevailing party. *See* 18 U.S.C. § 1836(b)(3)(A-D).

79.

Broughton Partners is entitled to injunctive relief, including but not limited to:

(a) prohibiting Defendants and all of their agents from making any useful disclosure and use of Broughton Partners' trade secret information;

(b) requiring that Defendants return to Broughton Partners all of its trade secret information, in whatever form, and all copies and derivatives of same;

(c)  requiring that Defendants provide evidence that is sufficient to conclusively establish that they have complied with the terms set forth in items (a) and (b) above;

(d)  requiring that Defendants identify all persons whom they contacted through their improper use of Broughton Partners' trade secret information; and

(e)  prohibiting Defendants, for a reasonable period of time, from working on or assisting with any legal advertising campaigns related to the subject matter of the trade secret(s) that they misappropriated.

80.

Broughton Partners is entitled to recover all damages sustained by Broughton Partners as a result of Defendants' misappropriation of Broughton Partners' trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(I), in an amount to be proven at the trial of this matter.

81.

Broughton Partners is further entitled to recover amounts from Defendants for any unjust enrichment resulting from Defendants' misappropriation of Broughton Partners' trade secrets, pursuant to 18 U.S.C. § 1836(b)(3)(B)(i)(II).

82.

Defendants willfully and maliciously misappropriated Broughton Partners' trade secrets, thus warranting an award to Broughton Partners of exemplary damages and the recovery of reasonable attorneys' fees and expenses pursuant to 18 U.S.C. § 1836(b)(3)(C) and 18 U.S.C. § 1836(b)(3)(D), respectively.

### IV.    COUNT II

## VIOLATION OF THE GEORGIA TRADE SECRETS ACT

83.

Plaintiff incorporates by reference Paragraphs 1 through 64 of its Complaint as if set forth verbatim.

84.

The Alliant report, lead lists, and form site logic that Eichholz disclosed to Defendants without the consent of Broughton Partners' other Members contain or constitute trade secret information under Georgia law, as the information derives economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use. This information is and at all relevant times has been subject to reasonable efforts by Broughton Partners to maintain its secrecy.

85.

Defendants unlawfully misappropriated Broughton Partners' trade secret information and Broughton Partners has sustained, and will continue to sustain, irreparable harm as a direct and proximate result of their unlawful actions. Unless otherwise restrained by this Court, Johnson Firm, Attorney Group, and Speedwater will cause further irreparable injury to Broughton Partners, for which there will be no adequate remedy at law.

86.

Defendants knew or reasonably should have known that the information disclosed was acquired under circumstances that gave rise to a duty to maintain its

secrecy and was acquired from persons who owed a duty to Broughton Partners to maintain its secrecy.

87.

Defendants unlawfully misappropriated Broughton Partners' trade secret information by acquiring it and, upon information and belief, disclosing and using it with knowledge that it was acquired through a person who had used improper means to acquire it.

88.

Broughton Partners is entitled to injunctive relief, including but not limited to:

(a) prohibiting Defendants and all of their agents from making any useful disclosure and use of Broughton Partners' trade secret information;

(b) requiring that Defendants return to Broughton Partners all of its trade secret information, in whatever form, and all copies and derivatives of same;

(c) requiring that Defendants provide evidence that is sufficient to conclusively establish that they have complied with the terms set forth in items (a) and (b) above;

(d) requiring that Defendants identify all persons whom they contacted while improperly using Broughton Partners' trade secret information; and

(e) prohibiting Defendants, for a reasonable period of time, from working on or assisting with any legal advertising campaigns related to the subject matter of the trade secret(s) that they misappropriated.

89.

Broughton Partners is entitled to recover damages caused by Defendants misconduct, including, without limitation: actual damages and unjust enrichment.

90.

Defendants willfully and maliciously misappropriated Broughton Partners' trade secrets, thereby warranting an award to Broughton Partners of exemplary damages and the recovery of reasonable attorneys' fees and expenses.

91.

Because Defendants willfully and maliciously misappropriated Broughton Partners' confidential and trade secret information, O.C.G.A. § 10-1-764 entitles Broughton Partners to recover its reasonable attorneys' fees.

## V. COUNT III

## CIVIL CONSPIRACY AGAINST JOHNSON FIRM, JOHNSON PC, AND ATTORNEY GROUP

92.

Plaintiff incorporates by reference Paragraphs 1 through 64 of its Complaint as if set forth verbatim.

93.

Defendants came to an express or tacit agreement to steal Broughton Partners' confidential information and trade secrets and use the confidential information and trade secrets for their own purposes and to their financial advantage in violation of Georgia's Trade Secrets Act.

94.

Defendants took affirmative steps to, and did, steal Broughton Partners' confidential information and trade secrets and use the confidential information and

trade secrets for their own purposes and to their financial advantage in violation of Georgia's Trade Secrets Act.

95.

Defendants are jointly and severally liable for all damages flowing from their conspiracy.

## VI.    COUNT IV

## <u>PUNITIVE DAMAGES AGAINST JOHNSON FIRM, JOHNSON PC, AND ATTORNEY GROUP</u>

96.

Plaintiff incorporates by reference Paragraphs 1 through 95 of its Complaint as if set forth verbatim.

97.

Through their conspiracy, Defendants have acted willfully, maliciously, fraudulently, wantonly and with that entire want of care which would raise a presumption of conscious indifference to the consequences of their actions.

98.

Pursuant to O.C.G.A. § 51-12-5.1, Broughton Partners is entitled to recover from Defendants punitive damages in an amount to be determined in the enlightened conscience of the finder-of-fact.

## VII.   COUNT V

## <u>BREACH OF CONTRACT AGAINST JOHNSON FIRM</u>

99.

Plaintiff incorporates by reference Paragraphs 65 through 68 of its Complaint as if set forth verbatim.

100.

Johnson Firm breached its contract with Broughton Partners by failing to pay agreed upon sums for services rendered, in an amount exceeding $361,000.00.

101.

Johnson Firm is liable to Broughton Partners for all damages naturally arising from its breach.

WHEREFORE, having stated its Complaint, Broughton Partners respectfully seeks the following relief:

(a) A trial by jury comprised of 12 persons;

(b) Permanent injunctive relief against Johnson Firm, Attorney Group, and Speedwater under the Defend Trade Secrets Act and the Georgia Trade Secrets Act;

(c) Actual, compensatory, and punitive damages under all common law or statutory law set forth here;

(d) All other attorneys' fees and other costs of litigation;

(e) Punitive damages in an amount to be determined in the enlightened conscience of the jury; and

(f) All other relief this Court deems appropriate.

This 9th day of June, 2023.

CAPLAN COBB LLC

*/s/ James W. Cobb*
JAMES W. COBB
Georgia Bar No. 420133
CAMERON B. ROBERTS
Georgia Bar No. 599839

75 Fourteenth Street NE
Suite 2700                                      *Attorneys for Broughton Partners*
Atlanta, Georgia 30309
jcobb@caplancobb.com
croberts@caplancobb.com


                                                OLIVER MANER LLP

                                                */s/ Benjamin M. Perkins*
                                                BENJAMIN M. PERKINS
                                                Georgia Bar No. 140997
                                                 WES P. RAHN
                                                Georgia Bar No.  609391

P.O. Box 10186                                  *Attorneys for Broughton Partners*
Savannah, GA 31412
(912) 236-3311
bperkins@olivermaner.com
wrahn@olivermaner.com

28